ESTATE OF JOSEPH J. VELLA, DECEASED, BETTY VELLA LAUNIUS, EXECUTRIX, AND BETTY VELLA LAUNIUS, FORMERLY BETTY R. VELLA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Vella v. Commissioner
Docket No. 10791-76.
United States Tax Court
T.C. Memo 1982-73; 1982 Tax Ct. Memo LEXIS 680; 43 T.C.M. (CCH) 528; T.C.M. (RIA) 82073; February 11, 1982. Ronald L. Boyer, for the petitioners. Val J. Albright, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(b)[1] as follows: Sec. 6653(b)
Year
Deficiency
Addition to Tax
1966
$ 6,426.49
$ 3,213.24
1967
4,348.49
2,174.24
1968
2,290.08
0
$ 13,065.06
$ 5,387.48
The issues for decision are: 1. Whether petitioners had unreported income in 1966, 1967, and 1968, and, if so, in what amounts; 2. Whether any part of the underpayments for 1966 and 1967 was due to fraud within the meaning of section 6653(b); 3. Whether the statute of limitations bars assessment of the deficiencies for 1966, 1967, and 1968; and 4. Whether petitioner Betty Vella Launius is entitled to relief under the innocent spouse provisions of section 6013(e). *682 FINDINGS OF FACT Petitioner Betty Vella Launius (Betty) and the deceased Joseph J. Vella (Joe) were married in 1965 and remained married until Joe's death in 1974. From 1965 to 1969, Joe and Betty resided at 10406 White Buck Trail, Rockford, Illinois. [2] At Joe's death on February 23, 1974, Joe and Betty lived in Benton County, Arkansas. At the time of filing the petition, Betty resided in New Castle, California. Prior to their marriage in 1965, both Joe and Betty had been divorced. Joe was married in 1949 to Nellie Zuklie, and divorced on December 31, 1964. Joe and Nellie had one child, Kathleen, born in aproximately 1951. Although custody was granted to Nellie in connection with the divorce, Kathleen resided during most of the years in question with Joe and Betty. Betty had two children from her previous marriage to Clinton Myers: Pamela Myers and Randall Myers, who lived with Joe and Betty. In addition to his daughter and Betty, Joe was survived by his mother, Maria Vella (sometimes *683 referred to as Marie), two brothers, Anthony (Tony) and Patrick (Pat or Pasquale), and a sister, Janet Mahan (also known as Jeanette). From 1960 through approximately April 1968, Tony resided with his wife (Millie), his sister, and his mother at his mother's house. He moved from that residence following Millie's suicide. Joe's father, Gaspare Vella (or Jasper), died in 1950, leaving a very small estate estimated atless than $ 5,000. Maria Vella has not remarried. From 1962 through 1967, she paid no Federal income tax and none was assessed against her. There is no record of any Federal gift tax return for Maria Vella from 1962 through 1967. In 1941, Joe was employed by the Barber Coleman Company, a manufacturing firm in Rockford, Illinois. In 1946, he worked for a gasoline station, also in Rockford. From 1952 through at least December 31, 1968, Joe was employed by Midwest Distributing Company (Midwest), Rockford, Illinois. During the years in issue, his duties consisted of servicing vending machines and coin-operated amusement devices, and specifically included collecting money from the machines and paying a percentage of the collected money to the owners or operators of *684 the establishments where the machines were located. Joe received as compensation from Midwest $ 7,105 in 1966, $ 7,555 in 1967, and $ 8,135 in 1968. Betty, too, has worked most of her adult life. Since graduating from high school, she has held a number of jobs, mostly involving cashier-clerk or secretarial positions. From January to July 1965, Betty was employed by Sems Manufacturing Company, Rockford, Illinois, earning approximately $ 3,500. From July 1965 through 1968, Betty was not employed outside the home and was a housewife, tending to her and Joe's three children. During this period, however, Betty occasionally worked without pay at Avenue Drive-in Liquors, a liquor store run by Joe and Tony, waiting on customers and doing odd jobs. In addition to his job with Midwest, Joe was involved in a number of businesses and investments. In 1957, he and Tony formed a partnership to operate Avenue Drive-In Liquors, a retail liquor store located in Rockford, Illinois. Joe withdrew from active participation in the partnership in 1961 prior to his divorce from Nellie; he resumed active participation in the on-going business in 1967. Throughout the partnership's operation, Tony's *685 wife, Millie, maintained the business books and records and purchased the retail merchandise. After Millie's death, Joe and Tony contracted on April 29, 1968, to sell, and subsequently did sell, the nonreal assets of the partnership. Joe's other business ventures included a gas station in Cherry Valley, Illinois, purchased in 1959; Stadium Quick Dry Cleaning & Launderette, a laundry business in Rockford, Illinois, acquired in approximately 1962; "Dog & Suds," a drive-in restaurant in Arkansas purchased sometime after 1968; two A & W Drive-In fest food restaurants in Arkansas acquired in approximately 1968 and 1969; and two laundromats in Arkansas bought in approximately 1969. In addition to these businesses, Joe invested in real estate, owning at various times and among other assets, interests in land in South Carolina with his brother Pat; three lots in the White Deer section of Deer Wood subdivision; lots in Arkansas with Betty; another lot in a subdivision in Illinois with Tony; and personal residences. Some of these investments were financed through bank loans, while some were purchased outright. On September 15, 1963, Betty's aunt by marriage, Erma C. Griswold, loaned *686 Betty $ 3,000 evidenced by a personal note with interest accruing at 5 percent. No other loan was made by Erma C. Griswold to Betty or Joe from 1963 through 1968. During the period March 2, 1960 to January 1, 1969, Joe invested in securities, most often through the securities brokerage firm of Hornblower & Weeks, Hemphill-Noyes and also purchased numerous savings bonds in the names of Kathleen Vella and Pamela and Randall Myers. He also obtained between 1964 and 1968 five certificates of deposit in the names of Joe and Kathleen Vella. Joe maintained a checking account at the First National Bank and Trust Company of Rockford (First National) from April 6, 1963 through October 9, 1967. After adjusting downward for checks cleared the following year, the account had a balance of $ 59.39 on December 31, 1965, and $ 427.95 on December 31, 1966. Betty maintained a checking account from 1965 through February 1968 at the City National Bank and Trust Company, Rockford, Illinois. This account had yearend balances (after downward adjustments) of $ 146.32 in 1965, $ 235.47 in 1966, and $ 0 in 1967. Betty and Joe opened a joint account at First National on August 17, 1967, of which the *687 yearend balances (after downward adjustments) were $ 249.14 for 1967 and $ 242.90 for 1968. Joe submitted a financial statement on or about May 26, 1966, to Norman Schultz, cashier, Alpine State Bank, Rockford, Illinois. In this statement, Joe listed his total assets as $ 106.200, his net worth as $ 88,417, and noted $9,000 as "Cash on hand and in Banks"; the total sum of $ 9,000 was attributed to a timed certificate of deposit. On their joint Federal income tax returns, petitioners declared the following: 1966
1967
1968
Income from employment
$ 7,105
$ 7,755
$ 8,135
Adjusted gross income
9,245
12,650
16,999
Taxable income
1,039
3,940
8,549
Under the "net worth plus personal expenditure" method of income reconstruction, petitioners had adjusted gross income computed as follows: [3]
*688 1966
1967
1968
Expenditures
$ 14,977.38
$ 16,662.38
$ 15,581.54
Increase in net worth
19,878.32
16,269.02
18,408.36
Adjusted gross income
34,412.70
29,757.40
22,533.40
Increase in adjusted gross
income (A.G.I. less reported
A.G.I.)
25,167.70
17,107.40
5,534.40
Sometime prior to August 6, 1968, an anonymous telephone caller informed the Internal Revenue Service in Chicago that Joe was "skimming" or diverting money from vending machines he serviced for Midwest; the caller also stated that Joe was engaged in business transactions with alleged crime syndicate figures. On September 4, 1968, Internal Revenue Service Special Agent Michael J. Anderson (Anderson) interviewed both Joe and Betty at their residence. He also spoke with Betty by telephone on September 20, 1968. Another interview occurred on March 26, 1969, which Joe alone attended. At least two other interviews followed with Joe alone on April 1, 1969, and November 25, 1969. On September 4, 1968, Joe informed Anderson that he possessed cash on hand not exceeding $ 1,000 at the end of each of the years 1963 through 1967. He stated that he kept a safety deposit box at First National *689 but that it contained no currency. He subsequently stated that he had kept up to $ 20,000 in the safety deposit box as savings accumulated since childhood, and that he used the money in the safety deposit box to buy securities and to make the $ 5,000 to $ 6,000 downpayment on property at 3104 South Main Street, Rockford. When the safety deposit box was inventoried on April 1, 1969, it contained approximately $ 5 in currency plus ten proof sets of coins at $ 3 a set. The register showed that Joe had entered the box on March 28, 1969. At the November 25, 1969, interview, Joe stated that he had borrowed money from his mother, Maria Vella, and that he borrowed from her whenever he needed cash. Prior to this November interview, Joe had stated that he had no undisclosed loans. In his interviews with Anderson, Joe also failed, when asked about his assets, to disclose that he owned lots 1, 3 and 4 in the Deer Wood subdivision in Rockford, that he owned an interest in real estate in South Carolina, that he owned certificates of deposit, and that he owned an interest in Stadium Quick Dry Cleaning & Launderette. Joe maintained a cash hoard which was stored in a metal box secreted in *690 a removable step leading to the attic in Maria Vella's house. The box contained a substantial amount of money, estimated by Tony as approximately $ 35,000, which did not decrease during the years in question. This accumulated cash was not treated by the Internal Revenue Service as an asset and accordingly does not figure at all in the net worth computations. The record does not show what happened to this cash. In September 1969, three armed burglars broke into Joe's house in Rockford. They stated that they knew of the Internal Revenue Service investigation and therefore believed that Joe must have a substantial sum of cash stored in the house. Threatening rape and murder, the held the family hostage before finally releasing them unharmed. Sometime in 1969 after this incident, Joe and Betty moved to Rogers, Arkansas. The Internal Revenue Service investigation culminated in Joe's indictment for Federal income tax evasion for 1966 and 1967. Prior to the trial of his case, on February 23, 1974, Joe died as a result of a sale-inflicted gunshot wound. On or before February 3, 1975, petitioners' duly authorized representative executed a conditional consent form (Form 872) extending *691 the period of limitations upon assessment of income tax for the taxable year 1968 until April 15, 1976. A second consent form was executed extending the period of limitations until December 31, 1976. The validity of these consent forms depends upon the applicability of section 6501(e), the 6-year statute of limitations in cases involving omissions in excess of 25 percent or more of the reported gross income. OPINION In the petition, petitioners challenge respondent's net worth determinations, deny the commission of fraud, plead the statute of limitations, and allege that Betty is not liable for any deficiencies. Petitioners, however, concern themselves mainly with sheltering Betty from liability for the deficiencies by relying on the innocent spouse provision of section 6013(e). As respondent bears the burden of proof on the fraud issue, sec. 7454, Rule 142(b), and on the statute of limitations exceptions, Rule 142(b); Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Seltzer v. Commissioner, 21 T.C. 398, 401 (1953); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F.2d 900 (6th Cir. 1944), *692 and as these issues depend on the net worth computations, we deem it necessary to consider briefly these issues even though they do not appear to be seriously contested. 1. Net Worth Computations
Under the net worth method, income is computed by determining a taxpayer's net worth (excess of assets at cost over liabilities) at the beginning and end of each year, and the difference between the two figures represents the increase in net worth. This increase is then adjusted by adding nondeductible expenditures, including living expenses, and by subtracting any nontaxable income items such as gifts, inheritances, loans, and the like. Holland v. United States,348 U.S. 121 (1954); [4]United States v. Giacalone,574 F.2d 328, 330-331 (6th Cir. 1978). Our findings set forth respondent's determinations for 1966 and 1967 and as revised for 1968 as to the increases in net worth, and reflect our conclusion that these determinations (as revised for 1968 only) are not erroneous. Welch v.d Helvering,290 U.S. 111 (1933); Rule 142(a). *693 Petitioners specifically challenge the correctness of respondent's determination of his opening net worth alleging (1) that the starting "cash on hand" figure of $ 1,000 for 1966, 1967, and 1968 was too low and (2) that respondent neglected to include a $ 6,000 loan or gift to petitioners from Joe's mother, Maria Vella, in 1968. A. Cash on Hand
Petitioners presented no evidence showing that the cash on hand exceeded $ 1,000. Joe initially told Internal Revenue Service agents that his cash on hand never exceeded $ 1,000 at yearend from 1963 through 1967, and that the safety deposit box contained no currency. When voluntarily filling out a financial statement for Alpine State Bank on May 26, 1966, he listed cash on hand as $ 9,000, but most or all of this sum was attributable to a timed certificate of deposit, making actual cash not tied up in certificates or banks a minimal sum. Evidence was presented by respondent, however, indicating two separate possible cash hoards, one located in a safety deposit box at the First National Bank and the second maintained under a step in Maria Vella's home. Only a trifling amount of money was found in the First National Bank safety *694 deposit box when it was inventoried. As for cash on hand in the cash hoard under the attic step, three witnesses (Tony, Pat, and Janet) testified that petitioner had a hoard of cash, which Tony testified that he counted at "Around $ 35,000" in 1965 (or "it could be--'64 or '66"). However, this source of funds simply was not taken into account in respondent's calculations of net worth. There is no evidence showing that funds from the box were used to purchase any of the assets upon which the net worth increase is based; indeed, the evidence indicates that the cash was constant or increasing in the years 1966 through 1968. We think that, as respondent argues, the box may have contained "additional unreported income which respondent has not charged to petitioners and which therefore * * * [is] not [an] issue in this case." We find no error in respondent's determinations as a result of his use of $ 1,000 as an approximate cash on hand figure as of December 31, 1965. B. Loans or Gifts from Maria Vella
Petitioners also alleged that respondent overlooked an item of $ 6,000 which Joe stated to the investigating agent that he had received in 1968 from his mother. Joe's statement *695 in this respect contradicted an earlier one to the effect that he had received no loans or gifts. There is no evidence to support such a transfer of funds to him. No loan documents were introduced in evidence; no gift tax returns were filed by Joe's mother; and respondent's agent found no pertinent financial transactions or accounts recorded in any bank in Rockford, Illinois. Moreover, Maria Vella was a widow of a man whose estate was estimated at less than $ 5,000; she filed tax returns reporting minimal income in 1962 and 1963 and no tax returns for 1964 through 1967. Three of her children, two of whom lived with her, testified that she was never employed outside the home and did not loan or give them any money in any of the years from 1965 through 1968. We thus find that petitioners have shown no errors in respondent's computation of opening net worth, and, after a careful examination of the exhibits and briefs, we conclude that respondent's calculations and methods were fair and proper. 2. Fraud
Respondent has determined an addition to tax under section 6653(b)[5] for 1966 and 1967 against the estate of Joseph Vella; he expressly states in his notice of deficiency *696 that, because no part of the fraud is attributable to Betty, no addition to tax is due from her. Respondent, of course, bears the burden of proof on the issue of Joe's alleged fraud. Sec. 7454(a); Rule 142(b). To establish fraud, respondent must show intentional wrongdoing with a specific purpose of evading a tax believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (7th Cir. 1968); Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). *697 Circumstantial evidence, such as conduct calculated to mislead the Internal Revenue Service or to conceal facts relating to income, will meet this burden. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). On consideration of the entire record, we hold that respondent has clearly and convincingly established that part of the underpayments in issue was due to fraud. Instances abound in which Joe attempted to mislead the Internal Revenue Service personnel or to conceal his true income for 1966 and 1967. In sum, (1) he made contradictory statements about his cash on hand; (2) he made inconsistent statements concerning loans from his mother; (3) he did not disclose the existence of the box in which he kept cash; (4) he stated on September 4, 1968, that he reported all his real estate holdings when he had not revealed the existence of three lots in the White Deer section of the Deer Wood subdivision; (5) he did not reveal the existence of certain certificates of deposit; and (6) he did not disclose his interest in Stadium Quick Dry Cleaning & Launderette. *698 The petition challenges the fraud determination specifically only by alleging that respondent did not establish a likely source of income. While this allegation is properly an element establishing the validity of net worth computations, we will consider it here in the rather summary fashion it deserves. Respondent has convincingly shown a likely source of the unreported income, namely, embezzlement from Joe's employer, Midwest. Showing a likely source does not require proof of actual receipt of income from the source, see United States v. Costello,221 F.2d 668 (2d Cir. 1955), affd. 350 U.S. 359 (1956). Showing an occupation or activity possessing the "indeterminate possibilities" that might lead to the unreported income will suffice. United States v. Costello,supra at 672. Tony testified that Joe was embezzling from his employer; the bank cashier, Norman Schultz, testified that Joe frequently exchanged coins for bills; and Tony, Pat, and Janet testified as to a hoard of cash which Joe kept in a box in his mother's residence. Joe *699 had an opportunity to embezzle coins from his employer since he handled large quantities of coins in his vending machine service work. Based on all of this evidence, which petitioner did nothing to rebut, we find that respondent has shown a likely source of unreported income. We hold that respondent has met his burden of proving fraud for which the estate of Joseph Vella is liable. 3. Statute of Limitations
Petitioners challenge the assessments for 1966, 1967, and 1968 as being barred by the statute of limitations. Respondent bears the burden of proof that the otherwise barred assessments fall within exceptions to the statute of limitations. Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Seltzer v. Commissioner,21 T.C. 398, 401 (1953); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F.2d 900 (6th Cir. 1944); Rule 142(b). He has sustained his burden. Section 6501(c)(1)[6] provides that in the case of a "false or fraudulent return with the intent to evade *700 tax," a tax may be assessed at any time. We have held that respondent has shown that at least part of the deficiencies was due to fraud within the meaning of section 6653(b). This same evidence is sufficient to show willful intent to evade a tax by means of a fraudulent return. This proof of fraud thus lifts the statute of limitations bar from Joe and from Betty for 1966 and 1967. Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner,56 T.C. 213, 227-228 (1971). Thus, we hold that deficiencies for those years were timely determined. A second exception makes timely the notice of deficiency for 1968. Section 6501(e)[7] provides that, where a taxpayer omits an amount exceeding 25 percent *701 of the gross income stated in the return, a tax may be assessed within 6 years after the return was filed. Both parties agree on brief that an amount equal to 25 percent of gross income stated was omitted. On January 24, 1975, petitioners' representative signed a conditional consent form pursuant to section 6501(c)(4) extending the assessment deadline to April 15, 1976; this period was subsequently extended to December 31, 1976. The notice of deficiency was mailed September 17, 1976, well within the second extension. As the consent was conditioned upon the applicability of section 6501(e), which the parties have agreed does apply, the consents functioned to make timely the deficency determination for 1968. Accordingly, we hold for respondent on this issue. *702 4. Innocent Spouse
The most fully contested issue is the applicability of section 6013(e). [8] This section, known as the "innocent spouse" provision, relieves a spouse of liability for the tax due for the year on a joint return to the extent the liability is attributable to an omission from gross income if three conditions are met: First, the amount omitted on the return was attributable to the "guilty" spouse and exceeded 25 percent of the gross income reported; second, the "innocent" spouse di not know or have reason to know of the omission; and third, the "innocent" spouse di not "significantly" benefit from the omitted income and it would be "inequitable" to hold her liable. Respondent has conceded that the first requirement has been met. The second and third conditions remain contested. *703 Betty bears the burden of proving that she meets each of these conditions. Adams v. Commissioner,60 T.C. 300, 303 (1973). We find that she has carried her burden and therefore is not liable for the deficiencies. A. Section 6013(e)(1)(B)--Knowledge of the Omissions
Whether the conditions of the second requirement, sec. 6013(e) (1)(B), have been met we consider a close question of fact. It is relevant, as petitioners argue, that Betty and Joe were not married until 1965, the year preceding the period here in controversy. Joe was 15 years older than she was, and he had just gone through a bitter divorce suit with his former wife. He shared few of the family business decisions with Betty during what she referred to as a "trial period" of some 3 or 4 years. We think it unlikely, therefore, that he would have disclosed his skimming operations to her. We have a direct conflict in testimony concerning Betty's actual knowledge of Joe's cash board. Tony testified that Betty knew of the $ 35,000 in the cash box where Joe kept his embezzled funds. Betty denied such knowledge. While the testimony of both Tony and Betty contains inconsistencies, we find *704 Betty the more credible witness. Tony testified that he saw Betty with Joe on at least one occasion when Joe had opened the cash box containing approximately $ 35,000. Tony also attempted in his testimony to implicate Betty in the exchange of coins at the bank for bills, but there is no credible testimony that she was involved. We note that Norman Schultz, then a cashier for the Alpine State Bank, testified that Joe exchanged coins for bills. Tony's credibility is further suspect because of his obvious hostility toward Betty. He testified that he got along well with Joe until Joe married Betty. A true animus against Betty is suggested by Betty's testimony that Joe's and Tony's relationship deteriorated further after Tony's wife, Millie, committed suicide. Betty felt that Tony held Joe responsible for Millie's death. After Joe's suicide, Tony admitted that he contacted the sheriff's office in Arkansas regarding the circumstances of Joe's death; it is uncertain whether this contact was purely informational or whether it was designed to have Betty submit to a polygraph test as to events leading to Joe's death. Betty testified that upon the request of the sheriff's department, *705 prompted by the urging of the Vella family, she took a lie detector test. No further inquiries were made by the sheriff. Betty also stated that Tony subsequently telephoned her directly and urged her to take a second polygraph test, this time in Illinois, apparently because he doubted the accuracy of the first test taken in her place of residence. We also take into account the fact that only Tony testified to seeing Betty with Joe when he opened the cash box. During the course of the Internal Revenue Service investigation of Joe's tax liabilities, Tony gave two affidavits, but neither one of them mentioned Betty's connection with the cash box. Based on our assessment of Tony's credibility, we accord his testimony little, if any, weight. We note, as respondent points out, that Betty's testimony is itself not free from inconsistency. In interviews with Internal Revenue Service agents she stated that she signed the 1966, 1967, and 1968 returns; at trial, however, she testified that she did not sign the 1966 and 1967 returns. [9] The earlier contradictory acknowledgment she attributes to wanting not to embarrass her husband. She also stated that she received a loan in 1965 from *706 her aunt, Erma Griswold, when, in fact, the loan was made in 1963. [10]
While these inconsistencies lessen Betty's credibility, we do not find them sufficient to discredit her otherwise forthright testimony. Given the difficulty she faces in trying to prove a negative (the lack of actual knowledge), and the incredibility *707 of the only direct evidence showing actual knowledge of the cash box, we find that Betty did not have actual knowledge of Joe's omission of income. The second inquiry under section 6013(e)(1)(B) involves determining whether Betty "had reason to know" of the omission of income. Courts have developed a test under this section which requires a decision as to whether a reasonably prudent person, with the alleged innocent spouse's knowledge of family finances, would have inferred that income was being omitted from the income tax returns. Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975); Estate of Jackson v. Commissioner,72 T.C. 356, 361 (1979). Moreover, a spouse cannot close her eyes to facts which might give her reason to know of the unreported income. Mysse v. Commissioner,57 T.C. 680, 699 (1972). Three specific often considered factors from which a reasonably prudent person would be expected to draw an inference that income was omitted from the returns are (1) unusual or lavish expenditures by the family; (2) participation *708 in business affairs or bookkeeping; and (3) the refusal of the "guilty" spouse to be forth-right about the couple's income. Sanders v. United States,supra at 167. A detailed account of expenditures between 1966 and 1968 has been made. While these figures may not include all personal expenditures, only three could arguably qualify as "lavish" or "unusual." Petitioners acquired new furniture priced at $ 2,182 in 1966 and $ 2,254.58 in 1967, bought and maintained a horse for Kathleen Vella at a cost of over $ 1,000 over the 3 years, and took a vacation of undisclosed cost to Miami for a bowling tournament. We note that the furniture was not paid for in a lump sum, but was bought on "time" according to Betty's testimony, and the other two expenditures, while perhaps unusual for a family reporting gross income of $ 9,245 in 1966, $ 12,650 in 1967, and $ 16,999 in 1968, are not so lavish as to have necessarily aroused suspicion in Betty's mind. See Sandersv. United States,supra;Mysse v. Commissioner,supra, where expenditures arguably more lavish than these were deemed insufficient to alert the innocent spouses. *709 The other two criteria, participation in business or bookkeeping and secrecy by guilty spouse, seem on balance to support Betty's innocent spouse contention. She did not participate in Joe's business ventures during the pertinent years [11] except to lend her name to some of the titles of some of the business ventures and to help out occasionally at Tony's and Joe's liquor store, waiting on customers and the like. We do not find any participation in business bookkeeping. As to knowledge of family finances, we find that Betty's familiarity was not sufficient to put a reasonably prudent person on notice of omitted income. Respondent calculates that expenditures exceeded reported adjusted gross income by approximately $ 5,700 in 1966 and approximately $ 4,000 in 1967, but reported income exceeded expenditures by approximately $ 1,400 in 1968. [12] We do not think that either of the amounts in 1966 and 1967 is so large as to alert Betty that income was being omitted. *710 During the relevant years, Betty testified that Joe handled most of the family finances. She did maintain two separate checking accounts: one in her name from June 30, 1965 to September 29, 1967, of which the monthly balance never exceeded $ 1,000 (and was usually considerably less); the other a joint account opened August 17, 1967, in which the monthly balance did not exceed $ 600 in 1967. [13] Moreover, as far as we can ascertain, the expenditures from Betty's account in 1966, the year of the greatest excess expenditures, was apparently slightly over $ 5,000, well below the reported income. [14]
Betty's knowledge of Joe's other financial affairs seems to have *711 been rather vague. She knew that he had cash at his mother's home and knew that he had other businesses, had securities, and would occasionally make money on the stock market. She testified, however, that she believed that Joe had accumulated savings throughout his life (he was about 44 when they married and had worked since childhood), and had acquired his investments prior to their marriage in 1965. New investments she believed to be heavily mortgaged. [15] While the record does not establish that Joe was unusually secretive about finances, we believe that he did not divulge to Betty the extent of his holdings, many of which he had acquired before their marriage, or their financial backing. Respondent argues that, in 1968, Betty knew of the sale of the laundromat (Stadium Quick Dry Cleaning & Launderette) which resulted in a $ 5,000 unreported long-term capital gain. As she knew of the ongoing Internal Revenue Service investigation, *712 respondent asserts that a reasonably prudent person in her position would have checked the 1968 return so as to have noted such a large omission. We disagree. We note that reported taxable income as reflected by the joint returns increased between 1967 and 1968 by approximately $ 4,000 ($ 16,999 compared with $ 12,650), an increase which would largely cover the gain on the laundromat sale. The increase is, to be sure, insufficient to cover another unreported capital gain of $ 8,729 in 1968, that derived from the sale of the nonreal assets of Avenue Drive-In Liquors. While Betty did not directly testify to knowing of this sale, we think she must have known because she sometimes worked in the store herself and must have noticed when Joe stopped working there. We do not think, however, that knowledge of the sale of these two businesses would have triggered suspicion in Betty's mind when she was accustomed to leaving all financial matters to her husband and their accountant, and where the 1968 return did evidence an increase of some 34.4 percent [16] over the previous year's adjusted gross income. There is no evidence that Betty knew what amounts were received from these sales. While *713 ignorance of tax consequences will not shelter a spouse, Quinn v. Commissioner,62 T.C. 223, 230 (1974), affd. 524 F.2d 617 (7th Cir. 1975); McCoy v. Commissioner,57 T.C. 732, 734 (1972), we think that, in the instant case, a reasonably prudent person, who had but scanty knowledge of the financial dealings, did not know the amounts received through the transactions, and who left most financial details to her husband, would not be put on notice of income omission in a year when reported adjusted income increased over one-third. To the extent Betty thought of these sales, this increase could have allayed any suspicion. We note that the innocent spouse statute is a remedial provision designed to counter the inequities which sometimes result from the imposition *714 of joint liability. See S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 608. Its provisions should thus be "construed and applied liberally in favor of those whom the statute was designed to benefit." Allen v. Commissioner,514 F.2d 908, 915 (5th Cir. 1975), affg. in part, revg. in part and remg. 61 T.C. 125 (1973). Considering the entire record, including the witnesses' credibility, we conclude that Betty had some knowledge of family finances and some incomplete information about Joe's investments, but did not know enough to give her either actual knowlege or reason to know of the omitted income. We hold that she has sustained her burden of proof for section 6013(e)(1)(B). B. Section 6013(e)(1)(C)--Whether Imposing Liability Would be Inequitable
The third hurdle for obtaining section 6013(e) relief is showing that it would be inequitable to hold the spouse liable for the tax. This showing must be made "on the basis of all the facts and circumstances"; one important factor to be considered is "whether the person seeking relief significantly *715 benefitted, directly or indirectly, from the items omitted from gross income." Sec. 1.6013-5(b), Income Tax Regs.
Respondent argues that, because Betty inherited an estate totaling a net amount of $ 120,000 (after liabilities and expenses), she has benefited significantly from the omitted income. In making this argument, respondent is correct that an inheritance of property in later years may constitute a significant benefit within the meaning of section 6013(e)(1)(C) if the receipt is traceable to the omitted items of income and, of course, if such benefit is "significant." S. Rept. No. 91-1537, supra,1971-1 C.B. at 608; [17]sec. 1.6013-5(b), Income Tax Regs. The facts, however, do not support the conclusion respondent asks us to reach. *716 According to respondent's determination, Joe and Betty had an opening net worth of $ 95,309.76 as of December 31, 1965. Because the net distribution from Joe's estate was $ 120,000, we are dealing with a maximum benefit of $ 25,000 which might be attributable to the omissions, not a benefit of $ 120,000 as respondent appears to argue. Our findings, moreover, show for each year the amount of omitted income, the amount of personal expenditures, and the amount available for possible inclusion in Betty's inheritance from Joe's estate as follows: 1966
1967
1968
Omitted Income
(Increase in A.G.I.)
$ 25,167.70
$ 17,107.40
$ 5,534.40 Expenditures
14,977.38
16,662.38
15,581.54 Available for
Inclusion
$ 10,190.32
$ 445.02
$ (10,047.14)
Thus, the net amount of the omissions of income in the 3 years is only approximately $ 590. Even assuming this amount to be traceable to Joe's estate, it is hardly a "significant" sum, especially in comparison with the deficiency in income tax which respondent seeks to sustain. Further, Joe's estate included an account receivable in the net amount of $ 49,940.99 from the sale of two laundromats in Rogers, *717 Arkansas, which were purchased in part with funds derived from the sale of the residence on White Buck Trail in Rockford, Illinois. Joe's estate also included a residence in Rogers, at a net value of $ 21,072 over and above a mortgage, which was bought with the proceeds of the sale of a home built in Rogers with funds derived from the sale of the White Buck Trail home. Significantly, Betty purchased the White Buck Trail house on May 23, 1965, prior to her marriage to Joe, for $ 25,000, assuming a mortgage of $ 18,254.40 and paying the remainder with the proceeds from the sale of her own house and with a loan from her family. Although Joe made payments on the mortgage and loan after their marriage, a substantial portion of Joe's estate at his death is thus traceable to Betty's premarital investment. Respondent's argument, moreover, ignores any appreciation in the value of the assets which Joe and Betty had on hand as of December 31, 1965, and which was no doubt reflected in the amount received in their liquidation. The stock listed in the financial statement submitted to the Alpine State Bank on May 26, 1966, had a value as of that date of approximately $ 2,000 above its cost *718 [18] as reflected in the net worth increase computations. The White Buck Trail house included in the opening net worth was bought for $ 25,000 and was shown in this financial statement as having a $ 29,000 value, an increase of $ 4,000. There is no evidence to indicate that those items depreciated after May 26, 1966, and the appreciation even to that date exceeded the net amount of income omissions. In the light of all the evidence, we conclude that it would be inequitable to hold Betty liable for the tax on Joe's ill-gotten gains. We think she has shown that she qualifies for relief under section 6013(e). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All "Rules" references are to the Tax Court Rules of Practice and Procedure.↩
2. At some point between Mar. 1967 and Apr. 9, 1968, the area in which Joe and Betty lived was subdivided. As a result, the 10406 White Buck Trail address became 6224 White Buck Trail.↩
3. For 1966 and 1967, these findings are based on respondent's determinations in the notice of deficiency, which petitioner has the burden of proving erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Although we recognize that respondent bears the burden of proving that "part" of the deficiencies was due to fraud, sec. 6653(b); sec. 7454(a); Rule 142(b)↩, it is clear that respondent's evidence is sufficient to sustain his burden. Petitioner, on the contrary, has not met his burden of proving respondent's determinations erroneous. For 1968, however, our findings of the amounts of increased net worth, adjusted gross income, and increase in adjusted gross income are derived from respondent's determinations as "revised" on brief. Respondent apparentldy has conceded that, for 1968, we should find as fact these revised figures, which are lower than those determined in the notice of deficiency.
4. The Supreme Court established the guidelines for use of the net worth method in Holland v. United States,348 U.S. 121 (1954), which involved a criminal prosecution. Subsequent courts have imposed the Holland guidelines in civil deficiency and fraud cases as well. See, Estate of Mazzoni v. Commissioner,451 F.2d 197, 199-200, fn. 4 (3d Cir. 1971), affg. a Memorandum Opinion of this Court; Fuller v. Commissioner,313 F.2d 73, 77 (6th Cir. 1963), affg. a Memorandum Opinion of this Court; Hoffman v. Commissioner,298 F.2d 784, 786 (3d Cir. 1962), affg. a Memorandum Opinion of this Court; Fairchild v. United States,240 F.2d 944↩ (5th Cir. 1957).
5. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shaldl e added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013↩, tis subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such apouse.
6. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
7. Sec. 6501(e) provides in part as follows: (e) Substantial Omission of Items.--Except as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
8. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. (e) Spouse Relieved of Liability in Certain Cases.-- (1) In general. Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.↩
9. The absence of Betty's signature would not in this case affect her joint liability for 1966 and 1967, as there is no evidence suggesting that Joe and Betty did not intend for the return to be joint. Estate of Campbell v. Commissioner,56 T.C. 1, 12↩ (1971). The statement thus is important only in assessing Betty's credibility.
10. Respondent counts a third instance of inconsistent testimony relating to a loan that Betty said her now deceased mother, Mrs. P. H. Stevenson, made. Mrs. Stevenson, in a 1969 statement to Internal Revenue Agent Vernon Pixley (Pixley), denied making such a loan, though she refused to sign an affidavit so stating. Pixley's testimony as to Mrs. Stevenson's statement is hearsay. See rules 802--804, Federal Rules of Evidence.↩ Although the testimony was admitted without objection, we do not give it much weight.
11. Betty did testify to working in the laundromats she and Joe acquired in Arkansas after their move there in 1969. During 1966-1968, however, she stated that she was a full-time housewife.↩
12. The excess expenditures, as set forth in the notice of deficiency, are as follows: ↩
1966
1967
1968
Expenditures
$ 14,977.38
$ 16,662.38
$ 15,581.54 Adjusted gross income
per return
9,245,00
12,650.00
16,999.00 Excess expenditures
$ 5,732.38
$ 4,012.38
$ (1,417.46)
13. The balance grew in 1968 due to a $ 5,000 deposit. We do not see that awareness of such increased funds should have alerted Betty to any oddities at tax time since expenditures did not exceed reported income in 1968. ↩
14. We arrive at this figure by totaling the checks for each month of 1966, save one, as reported in Betty's City National Bank and Trust Co. of Rockford ledger. Totals for the month of June are inexplicably missing. We have used an estimate of $ 400, bringing the total somewhat over $ 5,000.↩
15. The record shows that this is true as to the investments owned at the time of Joe's death and reported on the estate tax return. Bank loan records indicate that Joe had also relied on loans in making at least some prior investments.↩
16. 1968 reported adjusted gross income
$ 16,999
1967 reported adjusted gross income
12,650
$ 4,349 increase
$ 4,349 = $ 12,650 X 34.38 percent (approximately).↩
17. S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 608, states that while "ordinary support" does not qualify as a "benefit" within the meaning of this statute, a sec. 6013(e)(1)(C) "benefit" may-- be received * * * several years after the year in which the omitted item should have been included in gross income. For example, if a spouse receives an inheritance of property * * *, and such receipt is traceable to items omitted from gross income by the other spouse in earlier years, that spouse will be considered to have benefitted from those items. * * *↩
18. The cost of the stock and the values as shown in the statement and the stipulations are as follows: ↩
Cost
5/26/66 Value
150 shares Gen. Tel. & Elect.
$ 4,759.38
$ 6,300
200 shares Dayco Corp.
4,899.34
5,200
100 shares Pittsburgh Brewing Co.
663.50
800
500 shares Inv. Life Ins. Co.
2,000.00
2,500